**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

**CARLOS J. COPLEY,**

**Plaintiff,**

**v.** **Civil Action No.** 2:24-cv-00257
**Judge** ________________________

**POLARIS INDUSTRIES INC.,**
**a Delaware corporation, and**
**POLARIS INC., a Minnesota corporation,**

**Defendants.**

**COMPLAINT**

NOW COMES Plaintiff, Carlos J. Copley ("Plaintiff"), by counsel, Chris D. Pence, Jason P. Foster, and The Pence Law Firm PLLC, and for his Complaint against Defendant Polaris Inc., and Defendant Polaris Industries, Inc., (collectively referred to as "Defendants") state as follows:

**I. The Parties**

1. Plaintiff is and was at all times relevant to this civil action a resident of Mingo County, West Virginia.

2. At all times relevant to this civil action, Defendant Polaris Industries Inc. ("Polaris Industries"), was and is a corporation existing under the laws of the State of Delaware with a principal place of business located at 2100 Highway 55, Medina, MN.

3. At all times relevant to this civil action, Defendant Polaris Inc. ("Polaris"), was and is a corporation existing under the laws of the State of Minnesota with a principal place of business located at 2100 Highway 55, Medina, MN.

## II. Jurisdiction and Venue

4. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.§ 1332 because Plaintiff is a citizen of West Virginia, Polaris is a citizen of Minnesota, Polaris Industries is a citizen of Minnesota and/or Delaware, and the amount in controversy exceeds $75,000.00.

5. Polaris Industries and Polaris are subject to personal jurisdiction of this Court under W. Va. Code § 56-3-33(a)(4) and (5) by virtue of tortious acts and/or omissions in the State of West Virginia, which were the direct and proximate cause of Plaintiffs' injuries and damages.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 as a substantial part of the events giving rise to this civil action occurred in Mingo County, West Virginia.

## III. Allegations Common to All Counts

7. Upon information and belief, at all times relevant to this civil action, Defendants designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested and/or failed to test, inspected and/or failed to inspect, approved, labeled, advertised, promoted, marketed, supplied, distributed, sold and/or supplied certain utility terrain vehicles ("UTVs").

8. At all times relevant to this civil action, Defendants regularly solicited business in the state of West Virginia, engaged in a persistent course of conduct in West Virginia, and derived substantial revenue from products sold in the state of West Virginia, including UTVs.

9. Certain Polaris UTVs incorporate a roll-over protection system ("ROPS").

10. The ROPS incorporated into certain Polaris UTVs includes a structure comprised of, among other things, frame structure, hollow tubes, pillars, cross members, mounting brackets, bolted frame connections, anchors, fasteners, welded joints, gussets, and braces.

11. In the late afternoon on November 3, 2023, Dennis Lambert ("Mr. Lambert"), picked Plaintiff up from Plaintiff's residence in Mr. Lambert's 2023 Polaris Ranger, bearing VIN 4XARSY991P8071163 (the "Subject UTV").

12. The Subject UTV was equipped with a ROPS (the "Subject ROPS").

13. Over the course of the next several hours, Mr. Lambert and Plaintiff, among others, travelled to various remote locations in Mingo County, West Virginia, in the vicinity of Plaintiff's residence to fill wild game feeders.

14. Later that evening, Mr. Lambert was taking Plaintiff back to Plaintiff's residence and was lawfully and safely operating the Subject UTV in the east-bound lane of Dingess Road in Mingo County, West Virginia.

15. Mr. Lambert's minor son, C.L., was also operating a separate UTV (the "Lead UTV") and travelling just ahead of Mr. Lambert.

16. The two UTVS approached a left-hand curve (the "Curve") in Dingess Road.

17. The Lead UTV began to increase in speed and pulled away from the Subject UTV.

18. Even at a greater speed than the Subject UTV, the Lead UTV safely negotiated the Curve.

19. As the Subject UTV rounded the Curve, the front right wheel of the Subject UTV left the roadway.

20. The shoulder of the east-bound lane in the Curve slopes downward into a drainage ditch.

21. As the Subject UTV continued to negotiate the Curve, the passenger-side wheels dropped onto the sloping shoulder while driver-side wheels remained on the roadway, causing the Subject UTV to cant to a slight angle.

22. As the Subject UTV continued to negotiate the Curve, the top front passenger-side corner of the Subject ROPS clipped a tree on the reverse slope of the drainage ditch (the "Allision").

23. Upon making contact with the tree, the Subject ROPS nearly instantaneously and catastrophically failed, crushing rearward and down into the Subject UTV's passenger compartment.

24. During the Allision, certain failed components of the Subject ROPS impacted Plaintiff's head, neck and shoulder causing Plaintiff to lose consciousness.

25. The Subject UTV came to rest just beyond the tree after the Allision and Mr. Lambert, along with the other passengers in the Subject UTV, was able to extract Plaintiff from the Subject UTV and lay him on the ground.

26. Emergency services were immediately notified of the event and Plaintiff was transported from the scene by ambulance.

27. During and as a direct result of the Allision, Plaintiff sustained life-threatening injuries.

**COUNT I - STRICT LIABILITY**
**(DESIGN DEFECT)**

28. Plaintiff incorporates, repeats, and realleges each and every allegation contained elsewhere in the Complaint as though fully restated herein.

29. At all times material to this action, Defendants were in the business of designing, testing, approving, engineering, manufacturing, marketing, promoting, advertising, distributing,

selling and/or supplying Polaris UTVs and their component parts including the ROPS, for use in West Virginia and elsewhere across the United States.

30. At the time the Subject UTV left the control of Defendants, the ROPS incorporated in the Subject UTV was so defectively designed as to render it unsafe for its intended use. These design defects include, but are not limited to, the conditions described in the following sub-paragraphs:

a. The Subject vehicle was designed, tested, approved, engineered, manufactured, marketed, promoted, advertised, distributed, sold, and/or supplied without safety features that would prevent a collapse of the ROPS during the normal, foreseeable, expected and intended use of the Subject UTV such as the Allision;

b. The mounting plates, fasteners, and hardware used to secure the ROPS to the vehicle chassis were inadequately designed, leading to failure of the mounting points during the normal, foreseeable, expected and intended use of the Subject UTV such as the Allision;

c. The design of the geometry (thickness, diameter, and length) and materials used in the construction of the ROPS frame members were insufficient to withstand the forces associated with the normal, foreseeable, expected and intended use of the Subject UTV such as the Allision;

d. The ROPS was not properly designed to be integrated with the UTV's chassis, resulting in excessive flexing and/or deformation of the ROPS structure during the normal, foreseeable, expected and intended use of the Subject UTV such as the Allision, compromising its ability to protect occupants such as Plaintiff;

e. The fasteners and welded connection used to affix the ROPS components and mounting plates to the UTV were not sufficiently tough, allowing the ROPS to detach or come apart during the normal, foreseeable, expected and intended use of the Subject UTV such as the Allision; and

f. The inclusion of holes, openings and discontinuities in the design of the ROPS frame members created localized stress concentrations and reduced the strength of the members, thereby rendering the ROPS too weak to withstand the forces associated with the normal, foreseeable, expected and intended use of the Subject UTV such as the Allision.

31. The Subject ROPS and its components were expected by Defendants to reach end-users, including Plaintiff, without substantial change in the condition in which they were

designed, tested, approved, engineered, manufactured, marketed, promoted, advertised, distributed, sold and/or supplied.

32. The Subject ROPS and its components reached end-users, including Plaintiff, without substantial change in the condition in which they were designed, tested, approved, engineered, manufactured, marketed, promoted, advertised, distributed, sold and/or supplied.

33. Plaintiff is a person who Defendants would reasonably expect to use the Subject UTV and its components, including the Subject ROPS.

34. At all relevant times, there were numerous alternative feasible designs that would have rendered the Subject UTV and ROPS safer including, but not limited to, the following:

a. Optimized material selection and topological geometries with improved crashworthiness;

b. Damage tolerant and toughened ROPS mounting and vehicle frame integration; and

c. Integration of energy absorption topologies, multi-stage deformation and/or progressive mechanics collapse mechanisms.

35. It was reasonably foreseeable to Defendants that their ROPS could catastrophically fail during the normal, expected, and intended use of Polaris UTVs equipped with ROPSs, such as the Subject UTV.

36. It was reasonably foreseeable to Defendants that end-users such as Plaintiff could be injured in the event of a catastrophic ROPS failure during normal, expected, and intended use of Polaris UTVs equipped with ROPSs, such as the Subject UTV.

37. At all times relevant to this action, Plaintiff used the Subject utv and its component parts, including the Subject ROPS in a reasonably foreseeable manner within the scope of the normal, expected, and intended use of the Subject UTV and ROPS.

38. The design defects in the Subject UTV described above proximately caused Plaintiff's injuries and damages.

WHEREFORE, Plaintiff seeks damages and demands judgment against Defendants in excess of the limits of the Court's jurisdiction.

**COUNT II - STRICT LIABILITY**
**(MANUFACTURING DEFECT)**

39. Plaintiff incorporates, repeats, and realleges each and every allegation contained elsewhere in the Complaint as though fully restated herein.

40. At all times material to this action, Defendants were in the business of designing, testing, approving, engineering, manufacturing, marketing, promoting, advertising, distributing, selling and/or supplying Polaris UTVs and their component parts including the ROPS, for use in West Virginia and elsewhere across the United States.

41. At the time the Subject UTV left the control of Defendants, the ROPS incorporated in the Subject UTV was manufactured in such a defective condition as to render it unsafe for its intended use. These manufacturing defects include, but are not limited to, the conditions described in the following sub-paragraphs:

a. The Subject UTV was defectively manufactured, tested, approved, engineered, marketed, promoted, advertised, distributed, sold, and/or supplied without necessary safety features that would prevent a collapse of the ROPS during the normal, foreseeable, expected and intended use of the Subject UTV such as the Allision;

b. The mounting plates, fasteners, welds and hardware used to secure the ROPS to the UTV chassis were inadequately manufactured and selected, causing the ROPS to catastrophically fail during the normal, foreseeable, expected and intended use of the Subject UTV such as the Allision;

c. The geometry (thickness, diameter, and length), topology, and materials selection combination used in the construction of the ROPS frame members were defectively manufactured and assembled, as they were insufficient to withstand the forces associated with the normal, foreseeable, expected and intended use of the Subject UTV such as the Allision;

d. The ROPS was defectively integrated with the UTV's frame in manufacturing, resulting in excessive flexing or deformation of the ROPS structure during the normal, foreseeable, expected and intended use of the Subject UTV such as the Allision, thereby compromising the ROPS's ability to protect occupants such as Plaintiff.

42. The Subject ROPS and its components were expected by Defendants to reach end-users, including Plaintiff, without substantial change in the condition in which they were designed, tested, approved, engineered, manufactured, marketed, promoted, advertised, distributed, sold and/or supplied.

43. The Subject ROPS and its components reached end-users, including Plaintiff, without substantial change in the condition in which they were designed, tested, approved, engineered, manufactured, marketed, promoted, advertised, distributed, sold and/or supplied.

44. Plaintiff is a person who Defendants would reasonably expect to use the Subject UTV and its components, including the Subject ROPS.

45. It was reasonably foreseeable to Defendants that their ROPS could catastrophically fail during the normal, expected, and intended use of Polaris UTVs equipped with ROPSs, such as the Subject UTV.

46. It was reasonably foreseeable to Defendants that end-users such as Plaintiff could be injured in the event of a catastrophic ROPS failure during normal, expected, and intended use of Polaris UTVs equipped with ROPSs, such as the Subject UTV.

47. At all times relevant to this action, Plaintiff used the Subject utv and its component parts, including the Subject ROPS in a reasonably foreseeable manner within the scope of the normal, expected, and intended use of the Subject UTV and ROPS.

48. The manufacturing defects in the Subject UTV described above proximately caused Plaintiff's injuries and damages.

WHEREFORE, Plaintiff seeks damages and demands judgment against Defendants in excess of the limits of the Court's jurisdiction.

**COUNT III - STRICT LIABILITY**
**(MALFUNCTION THEORY)**

49. Plaintiff incorporates, repeats, and realleges each and every allegation contained elsewhere in the Complaint as though fully restated herein.

50. The near-instantaneous and catastrophic failure of the Subject ROPS during the Allision would not normally happen in the in the absence of a design and/or manufacturing defect.

51. Neither Plaintiff nor Mr. Lambert were using the Subject UTV and ROPS in an abnormal manner.

52. There is no reasonable secondary cause for the near-instantaneous and catastrophic failure of the Subject ROPS during the Allision.

53. The malfunction in the Subject UTV and ROPS described above proximately caused Plaintiff's injuries and damages.

WHEREFORE, Plaintiff seeks damages and demands judgment against Defendants in excess of the limits of the Court's jurisdiction.

**COUNT III – NEGLIGENCE**

54. Plaintiff incorporates, repeats, and realleges each and every allegation contained elsewhere in the Complaint as though fully restated herein.

55. Defendants had a duty towards members of the general public, such as Plaintiff, to use ordinary care in the design, testing, approval, engineering, manufacturing, marketing, promoting, advertising, distributing, selling and/or supplying UTVs and their component parts such as the Subject ROPS to avoid reasonably foreseeable risks of injury caused by defects and inadequacies in the Subject UTV and its components, including the Subject ROPS.

56. In particular, Defendants had a duty to design, test, approve, engineer, manufacture, market, promote, advertise, distribute, sell and/or supply UTVs and their component parts such as the Subject ROPS in such a manner that the ROPS would not catastrophically fail during normal, expected, and intended use.

57. Defendants had a duty to test, approve, engineer, manufacture, market, promote, advertise, distribute, sell and/or supply Polaris UTVs and their component parts such as the Subject ROPS in such a manner that it contained adequate safety mechanisms to prevent catastrophic ROPS failures.

58. Defendants negligently failed to exercise reasonable care to prevent the Subject UTV and its components, including the Subject ROPS, from creating an unreasonable risk of harm to end-users such as Plaintiff who would use the Subject UTV in normal, intended, expected, and foreseeable ways.

59. Defendants Polaris negligently designed, tested, approved, engineered, manufactured, marketed, promoted, advertised, distributed, sold and/or supplied Polaris UTVs and their component parts such as the Subject ROPS in such a manner that the ROPS could catastrophically fail during the normal, expected, and intended use of the Subject UTV.

60. Defendants negligently designed, tested, approved, engineered, manufactured, marketed, promoted, advertised, distributed, sold and/or supplied Polaris UTVs and their component parts such as the Subject ROPS in such a manner that the Subject UTV lacked reasonable protection to end-users such as Plaintiff from injury in the event of a catastrophic ROPS failure during the normal, expected, and intended use of the Subject UTV.

61. At the time of the design, testing, approval, engineering, manufacturing, marketing, promoting, advertising, distributing, selling and/or supplying of the Subject UTV and

ROPS, Defendants were aware or should have been aware of the defects in the ROPS but failed to take reasonable measures to correct and/or protect against the dangers created by such defects.

62. At the time of the design, testing, approval, engineering, manufacturing, marketing, promoting, advertising, distributing, selling and/or supplying of the Subject UTV, Defendants were aware or should have been aware of other designs and technologies which could better protect end-users such as Plaintiff from foreseeable catastrophic ROPS failures but chose not to utilize such safer designs and technologies.

63. Defendants' negligence as described above proximately caused Plaintiff's injuries and damages.

WHEREFORE, Plaintiffs seek damages and demand judgment against Polaris in excess of the limits of the Court's jurisdiction.

**IV. Relief Requested**

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for damages as follows:

a. Medical and hospital bills for diagnostic and preventative treatment and therapies and for treatment of injuries, both past and future;

b. Physical injuries, both temporary and permanent;

c. Severe and significant emotional distress, and mental pain and suffering, both temporary and permanent;

d. Fear, humiliation, and embarrassment, past and future;

e. Annoyance and inconvenience, past and future;

f. Loss of physical health and well-being, past and future;

g. Loss of enjoyment of life, past and future;

h. Loss of income and/or earning capacity, past and future;

i. Loss of value of employment benefits, including, but not limited to, loss of value of pension/retirement benefits;

j. Disability;

k. Disfigurement;

l. Compensatory damages;

m. Punitive and exemplary damages;

n. Civil penalties;

o. Attorney's fees and costs;

q. Pre- and post-judgment interest;

r. All statutory, common-law, and equitable relief to which the Plaintiffs may be entitled; and

s. Such other and further relief as justice requires.

## V. Jury Demand

Plaintiff hereby demands a trial by jury upon all issues raised herein triable by jury.

**CARLOS J. COPLEY,**

**Plaintiff,**

**By Counsel:**

*/s/ Jason P. Foster*

Christopher D. Pence (WVSB No. 9095)
Jason P. Foster (WVSB No. 10593)
Michael W. Taylor (WVSB No. 11715)
Pence Law Firm PLLC
10 Hale Street, 4th Floor (25301)
Charleston, WV 25329
Telephone: (304) 345-7250
Fax: (304) 553-7227
Email: cpence@pencefirm.com
jfoster@pencefirm.com